UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN DOE,<br><br>　　　　　　Movant,<br><br>　　v.<br><br>UNITED STATES SECURITIES AND<br>EXCHANGE COMMISSION,<br><br>　　　　　　Respondent. | Case No. 22-mc-80301-LB<br><br>**ORDER DENYING MOTION TO QUASH**<br><br>Re: ECF Nos. 1, 10 |

## INTRODUCTION

The SEC is investigating John Doe for possible insider trading relating to his trades in the securities of Coherent, Inc., and NeoPhotonics Corp. It subpoenaed his bank records at four banks. Doe moved to quash the subpoenas under the Right to Financial Privacy Act on the grounds that the SEC's investigation is limited to Coherent shares, the SEC did not establish a reasonable belief that the records are relevant, and the subpoenas are overbroad. The court denies the motion.

## STATEMENT

On January 19, 2021, Lumentum announced it would acquire Coherent. After the announcement, Coherent's shares closed 29 percent higher than the previous trading day's closing. On November 4, 2021, Lumentum announced it would acquire NeoPhotonics. After the announcement, NeoPhotonics' shares closed 38.8 percent higher than the previous trading day's

United States District Court
Northern District of California

1    closing. The SEC is investigating Doe for possible insider trading involving his trading in

2    Coherent and NeoPhotonics securities.[1]

3        Through its investigation, the SEC learned that Doe earned about $962,410 by trading in the

4    securities of Coherent and NeoPhotonics at the time of Lumentum's acquisition announcements:

5    he traded in Coherent shares in January 2021 and in NeoPhotonics shares from June 2021 to

6    November 2021.[2] Most of the $962,410 in earnings was from his trades in NeoPhotonics shares.[3]

7    For both companies' securities, Doe bought call options before the announcements.[4] Before 2021,

8    Doe had not traded in either company's securities. "SEC economists analyzed Doe's overall

9    trading in recent years. They preliminarily concluded that Doe's training in Coherent and

10   NeoPhotonics securities was highly unusual when judged on a variety of metrics, including timing

11   of the trades and profitability."[5]

12       The SEC's investigation revealed that Doe's great nephew is a vice president for product-line

13   management at Lumentum and had material nonpublic information about both acquisition

14   announcements. Doe was in frequent contact with his great nephew during his trading in shares of

15   Coherent and NeoPhotonics before the announcements.[6]

16       The SEC asserts that it is entitled to the records:

17           The SEC is entitled to the subpoenaed records because the SEC has a 'reasonable
             belief that the that the records are relevant' to an SEC investigation. The bank
18           records are relevant because they will provide Staff with information about whether
             Doe or others engaged in insider trading and the extent of their insider trading.
19           Specifically, the records may provide information that Doe made payments to his

20

21   ---

     [1] Disc. Letter Br. – ECF No. 10 at 2–3. Citations refer to material in the Electronic Case File (ECF);
22   pinpoint citations are to the ECF-generated page numbers at the top of documents.

23   [2] *Id.* at 3; Opp'n – ECF No. 17 at 4 & n.4.

24   [3] The SEC initially estimated that Doe earned about $75,000 from his trading in Coherent shares, but
     then revised its overall estimate of earnings from the trades in both companies' shares without
25   specifying what portion came from trades in Coherent shares. Disc. Letter Br. – ECF No. 10 at 3;
     Opp'n – ECF No. 17 at 4 & n.4. Doe says that he earned $42,397 from his trades in Coherent shares
26   before the acquisition announcement and about $850,000 from his trades in NeoPhotonics shares.
     Reply – ECF No. 19 at 7–9.

     [4] Disc. Letter Br. – ECF No. 10 at 3.
27
     [5] Opp'n – ECF No. 17 at 4.
28
     [6] *Id.* at 4–5; Disc. Letter Br. – ECF No. 10 at 3.

United States District Court
Northern District of California

great nephew or a third party in exchange for [material nonpublic information]. The records may also show whether Doe received payments in exchange for providing [material nonpublic information] to others or received payments from persons who helped finance his insider trading. The records may also help identify additional bank accounts that are relevant to the investigation or assist Staff in locating ill-gotten gains for disgorgement purposes should Doe be named as a defendant in an SEC enforcement action. Simply put, the SEC's task is to follow the money, and Doe's bank accounts are relevant to that trail.[7]

As a result of its investigation, the SEC filed insider-trading charges against the former chief information-security officer at Lumentum and four of his friends for trading in Coherent and NeoPhotonics shares ahead of the acquisition announcements. The SEC also settled inside-trading charges against a coworker of Doe's great nephew for trading in Coherent stock and options ahead of the Coherent announcement.[8]

Doe provides more information about his trading activity. In the letter brief, he said that on January 15, 2021, he bought twenty-one call options of Coherent stock at a $151 strike price and sold ten call options at a $165 strike price, with all options expiring on February 19, 2021. On January 21 (after Coherent's January 19 announcement of the Lumentum acquisition), Doe covered his short sale at a $38,007 loss. On January 22, he bought ten call options at a $200 strike price and sold ten call options at a $215 strike price, with all options expiring on February 19. When he covered, he lost $9,003. He contends that people who engage in illegal insider trading would not invest in a hedged transaction that lost money.[9]

In his subsequent reply brief, Doe said that on January 15, 2021, he bought the call options at a $155 strike price and had a gain of $74,480 from them. He had an offsetting loss of $32,443, though, from the call options he bought at a $165 strike price. This, he says, was "a hedged transaction that looks nothing like what an inside trader would do." And in the reply brief, Doe says his trades in Coherent shares after the acquisition announcement resulted in a $45,568 gain. These gains (both before and after the acquisition announcement) were "consistent with gains [he]

---

[7] Opp'n – ECF No. 17 at 9 (cleaned up).

[8] Id. at 4 nn.3–4.

[9] Disc. Letter Br. – ECF No. 10 at 1–2.

1  achieved in other stocks in 2021 and in prior years."[10]

2      Also, Doe is a day trader who trades in many stocks: his 2021 Schwab account statement is

3  730 pages. "His call options for Coherent stock in January 2021 came after Coherent's stock

4  prices jumped from $120.59 to $151.95 between November 27, 2020, and January 15, 2021."

5  Coherent had not issued any press releases during this time regarding potential acquisitions or

6  financial results. This would lead "any observer to infer that Coherent might be engaged in

7  acquisition discussions, especially since Coherent and II–VI (the company that ultimately outbid

8  Lumentum for Coherent) announced a supply agreement between the two companies on December

9  16, 2020. Coherent's stock price rose steadily after that announcement."[11]

10      On February 12, 2021, II–VI offered $260 per share for Coherent's shares. Doe bought shares

11  and call options for Coherent through March 24, 2021, when he bought shares for $265 per share.

12  He contends that while he profited from his Coherent trades, his trading history "belies any

13  suspicion that he did so based on insider information." Also, his earnings from trades in Coherent

14  and NeoPhotonics that the SEC mentions include trades made before and after public

15  announcements of the purported inside information.[12]

16      According to an SEC complaint against Amit Bhardwaj in the Southern District of New York,

17  Lumentum and Coherent had nonpublic discussions about an acquisition between fall 2019 and

18  March 2020. Doe argues that a person with inside information about Lumentum's interest in

19  Coherent would have bought stock then, and especially in March 2020, when Coherent was selling at

20  $89 per share. Doe did not buy then and has no connection to anyone named in the SEC's lawsuit.[13]

21      Doe denies that he had any material inside information about any companies or that he engaged

22  in insider trading at any time.[14] Doe produced his Schwab and Robinhood trading records, which

23

24

---

25  [10] Reply – ECF No. 19 at 7–8.

26  [11] Disc. Letter Br. – ECF No. 10 at 2; Doe Decl. – ECF No. 2-3 at 3 (¶¶ 8–14).

    [12] Disc. Letter Br. – ECF No. 10 at 2.

27  [13] *Id.* (citing *SEC v. Bardwaj*, No. 1:22-cv-06277 (S.D.N.Y) – ECF No. 1).

28  [14] Doe Decl. – ECF No. 2-3 at 3 (¶ 8).

United States District Court
Northern District of California

show all trades at issue here.[15] The funds that he used to buy the securities at issue did not come from the four subpoenaed banks (East West Bank, Fremont Bank, Umpqua Bank, and Wells Fargo Bank, N.A.). All purchases in the Schwab account were funded through the account itself (through margin loans or the sale of other securities). No proceeds were transferred from the Schwab account to any bank. Except for a transfer of funds from Bank of America into the Schwab account in 2020 or 2021, no funds were ever exchanged between the Schwab account and any bank. No funds were ever transferred between the Robinhood account and any of the four respondent accounts.[16]

On September 16, 2022, the SEC served a subpoena on Doe for documents related to his trading in Lumentum, Coherent, and NeoPhotonics.[17] Doe produced his brokerage-account statements and records and the identity of the bank accounts but objected to producing bank records because they did not "reflect trades in the securities of the three companies identified in your subpoena."[18] The SEC subpoenaed the banks directly. The notice packet describes the investigation:

> On February 17, 2021, the Commission entered a formal order of investigation, "In the matter of Coherent, Inc. (TISO)." The attached subpoena was issued pursuant to the formal order of investigation, and the information sought is to assist the Commission in determining the issues set forth in the formal order of investigation. That order states that the Commission deems certain acts and practices to be in possible violation of: Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[19]

The formal order, dated February 17, 2021, is titled "In the Matter of Trading in the Securities of Coherent, Inc." and describes the scope of the investigation:

> **II.**
>
> The Commission has information that tends to show that from at least November 2020, in possible violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, certain persons and/or entities, directly or indirectly, in connection with the purchase or sale of certain securities, may have been or may be employing devices, schemes, or artifices to defraud, making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were or are made,

---

[15] Disc. Letter Br. – ECF No. 10 at 1–2.

[16] Doe Decl. – ECF No. 2-3 at 3–4 (¶¶ 15–16).

[17] SEC Subpoena, Ex. A to Norton Decl. – ECF No. 1-2. The discovery letter brief limits the trades to Coherent and NeoPhotonics securities. Disc. Letter Br. – ECF No. 10 at 1–2.

[18] Shapiro Letter, Ex. B to Norton Decl. – ECF No. 1-3 at 5 (¶¶ 6–7, 10–12).

[19] SEC Letter, Ex. C to Norton Decl. – ECF No. 1-4 at 2.

not misleading, or engaging in acts, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon any person. In connection with these activities, such persons or entities, directly or indirectly, may have been or may be, among other things, trading in the securities of COHR [Coherent] on the basis of material nonpublic information, or disclosing to others material nonpublic information regarding COHR, in breach of a fiduciary or other duty arising out of a relationship of trust and confidence. While engaged in the above-described activities, such persons or entities, directly or indirectly, may have been or may be making use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange.

### III.

The Commission, deeming such acts and practices, if true, to be possible violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, finds it necessary and appropriate and hereby:

ORDERS, pursuant to the provisions of Section 21(a) of the Exchange Act, that a private investigation be made to determine whether any persons or entities have engaged in, or are about to engage in, any of the reported acts or practices or any acts or practices of similar purport or object. . . .[20]

The SEC has limited the subpoenas' scope to January 2020 to October 26, 2022, and to transactions over $500 and account-opening and safety-deposit-box information.[21] An SEC staff attorney designated to conduct the investigation declared under penalty of perjury under 28 U.S.C. § 1746 that he was familiar with the facts of the investigation and "certified" that the facts in the opposition were true and correct to the best of his knowledge and belief.[22]

All parties consented to magistrate-judge jurisdiction. 28 U.S.C. § 636.[23] The court initially required the parties to confer to try to reduce their disputes (which they did) and held two hearings (one before the SEC's response, and one immediately after).

### ANALYSIS

Under the Right to Financial Privacy Act, the SEC may obtain bank records like these only if (1) "there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry" and (2) the SEC has given the customer the subpoena and a notice that "state[s] with

---

[20] SEC Order, Ex. E to Norton Suppl. Decl. – ECF No. 19-1 at 4–5.

[21] Disc. Letter Br. – ECF No. 10 at 3; Opp'n – ECF No. 17 at 5.

[22] Geller Decl. – ECF No. 17-1 at 1–2 (¶¶ 1–2).

[23] Consents – ECF Nos. 12, 13.

1    reasonable specificity the nature of the law enforcement inquiry." 12 U.S.C. § 3405(1)–(2).

2        A bank customer like Doe can move to quash SEC subpoenas by submitting an application

3    with an affidavit or sworn statement "stating the applicant's reasons for believing that the financial

4    records sought are not relevant to the legitimate law enforcement inquiry stated by the

5    Government authority in its notice, or that there has not been substantial compliance with" the

6    Act's procedural requirements. *Id.* § 3510(a). After a customer submits the affidavit, the district

7    court "shall order the Government authority to file a sworn response, which may be filed in

8    camera if the Government includes in its response the reasons which make in camera review

9    appropriate. If the court is unable to determine the motion or application on the basis of the

10   parties' initial allegations and response, the court may conduct such additional proceedings as it

11   deems appropriate." *Id.* § 3510(b).

12       "If the court finds . . . that there is a demonstrable reason to believe that the law enforcement

13   inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry, it

14   shall deny the [customer's] motion or application, and . . . order such process enforced." *Id.* §

15   3410(c). But "[i]f the court finds . . . that there is not a demonstrable reason to believe that the law

16   enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to

17   that inquiry, or that there has not been substantial compliance with the provisions of this chapter, it

18   shall order the process quashed." *Id.*

19       Doe moved to quash the subpoenas on the grounds that the SEC's investigation is limited to

20   Coherent, the SEC did not submit the appropriate sworn response or establish a reasonable belief

21   that the records are relevant, and the subpoenas are overbroad.[24] The court denies the motion.

22       First, Doe concedes that "the SEC may be conducting a legitimate investigation into trading

23   [in] Coherent shares, as authorized by a formal order," but contends that the Coherent

24   investigation does not include NeoPhotonics. He asks to quash the subpoenas or limit them to the

25   "specifically described investigation [into] Coherent securities during the nine-month period of

26

27

----

28   [24] Disc. Letter Br. – ECF No. 10 at 3–6 (narrowing issues); Reply – ECF No. 19 at 2 (describing issues).

United States District Court
Northern District of California

Doe's trading."[25] The SEC counters that to trace the funds related to the Coherent transactions, it needs to review records from the calendar year before the transaction (meaning, 2020) through the dates of the subpoenas. Also, the bank records relating to possible insider trading of NeoPhotonics securities are the same as those relating to possible insider trading of Coherent securities. It also contends that it can investigate NeoPhotonics securities because that matter concerns another acquisition by Lumentum involving the same inside source (the great nephew).[26]

The formal order authorizes an investigation of insider trading in Coherent securities. But it also authorizes an investigation of "any acts or practices of similar purport or object."[27] If the same insider is providing information about another acquisition by Lumentum, that is an act or practice of similar purpose or import, and the order is not limited to the named entity Coherent.

In *RNR Enters. v. SEC*, for example, the SEC issued an administrative subpoena ad testificandum to individuals and their company as part of the SEC's investigation into the offer and sale of securities in ventures involving telecommunications technologies subject to licensing by the FCC. 122 F.3d 93, 95 (2d Cir. 1997). The individuals and their company were not named in the formal order, which authorized an investigation to determine whether "any persons" had engaged in the alleged acts or practices or acts and practices "of similar purport or object." *Id.* The SEC moved to enforce its subpoena and the district court granted the motion, rejecting the respondents' argument that the subpoena violated their due-process rights and the Administrative Procedure Act. *Id.* at 96.

The Second Circuit affirmed. *Id.* at 96–98. It noted its limited role in a proceeding to enforce an administrative subpoena: the SEC must show an investigation with a legitimate purpose and an inquiry relevant to that purpose. *Id.* at 96. The investigation was legitimate: the SEC had information suggesting violations of the securities laws in connection with the offer and sale of telecommunications-technology securities. *Id.* at 97. And the information sought was relevant to

---

[25] Disc. Letter Br. – ECF No. 10 at 3 (emphasis omitted); Reply – ECF No. 19 at 15–16.

[26] Disc. Letter Br. – ECF No. 10 at 3–4; Opp'n – ECF No. 17 at 15–16.

[27] SEC Order, Ex. E to Norton Suppl. Decl. – ECF No. 19-1 at 4–5.

United States District Court
Northern District of California

1     that investigation. *Id.* at 97. The court deferred to the agency's appraisal of relevancy. *Id.* (citing

2     Second Circuit authority). Although the SEC's formal order did not name the respondents, it

3     described companies of a specific type that included the respondents, and it specified the reasons for

4     its investigation: the offering by such companies of unregistered securities. *Id.* The subpoena was

5     within the scope of the formal order, and the respondents did not carry their burden of showing that

6     the subpoena was unreasonable. *Id.*

7          That analysis applies here. The investigation covers insider trading, either relating to

8     Lumentum's acquisition of Coherent or relating to other acts "of similar purport or object," like

9     insider trading relating to the NeoPhotonics acquisition, which allegedly involved the same

10    insider. *See id.*; *accord MBIA v. Fed. Ins. Co.*, 652 F.3d 152, 160–61 (2d Cir. 2011) (insurance

11    coverage turned on whether the SEC's formal order, which authorized the SEC's investigation

12    into securities fraud and accounting/reporting misstatements, included the SEC's investigation into

13    conduct by an unnamed entity; the Second Circuit held that the order covered the investigation of

14    the entity by authorizing an investigation into "courses of business of similar purport or object").

15         Doe distinguishes *RNR* and *MBIA* on the ground that neither was decided under the Right to

16    Financial Privacy Act.[28] But the SEC's burden under the Act is not a heavy one. *Nelson v. SEC*,

17    No. C08-80080MISC JF (HRL), 2008 WL 2444794, at *2 (N.D. Cal. June 16, 2008). Doe does

18    not dispute that the SEC's investigation, at least about the Coherent investigation, is related to a

19    legitimate law-enforcement inquiry. The formal order covers similar conduct by the same insider.

20    The records are relevant to that investigation. Also, as a practical matter, the records are the same,

21    even if the inquiry is limited to Coherent. The court denies the motion to quash on this ground.

22         Relatedly, Doe effectively contends (in the letter brief but not the reply brief) that a formal

23    order about insider trading in Coherent's securities, plus "acts or practices of similar purport or

24    object," cannot extend to insider trading in NeoPhotonic's securities for purposes of an

25    administrative subpoena challenged under the Right to Financial Privacy Act. He reasons that the

26    phrase "similar purport or object," when used to cover insider trading in NeoPhotonic's securities,

27

28    ―――――――――
      [28] Disc. Letter Br. – ECF No. 10 at 3; Reply – ECF No. 19 at 15–16.

1    does not satisfy the Act's requirement that the SEC describe its investigation "with reasonable

2    specificity."[29] 12 U.S.C. § 3405(2).

3        The "reasonable specificity" requirement is satisfied if the customer has sufficient information

4    to challenge the factual basis of the subpoena. *Nicksolat v. U.S. Dep't of Transp.*, 277 F. Supp. 3d

5    122, 128–29 (D.D.C. 2017). The customer need only be given notice of "the thrust of the

6    government's investigation," not "the evidence that spurred the investigation." *Id.* at 129.

7        Here, the notice "invited Doe to arrange to view the Formal Order, which [he] did."[30] Doe thus

8    was aware of the thrust of the investigation, including that it covered "acts or practices of similar

9    purport or object" to the alleged insider trading in Coherent securities.

10       In sum, the SEC's use of the phrase "acts or practices of similar purport or object" in the

11   formal order is not a valid ground to challenge the subpoenas as applied to NeoPhotonics insider

12   trading under the Right to Financial Privacy Act. Insider trading in NeoPhotonics securities has a

13   similar purport or object to insider trading in Coherent securities where Lumentum announced

14   acquisitions of both companies, the customer profited from trades preceding both announcements,

15   and the customer is a family member of (and was in contact with) a Lumentum executive who had

16   the relevant material nonpublic information before both announcements.

17       Second, Doe contends that the SEC attorney's declaration is not the sworn response required

18   by 12 U.S.C. § 3510(b). 28 U.S.C. § 1746 requires a declarant to "declare (or certify, verify, or

19   state) under penalty of perjury that the foregoing is true and correct" and requires only that the

20   declaration "substantially" comply with this suggested language. 28 U.S.C. § 1746; *CFTC v.

21   Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999). The SEC investigative attorney here

22   declared "under penalty of perjury, in accordance with [§ 1746], that the following is true and

23   correct . . . [and] is based on my personal knowledge." He said that he helped conduct the

24   investigation, was familiar with the facts, and certified that the facts in the opposition were "true

25

26

27   [29] Disc. Letter Br. – ECF No. 10 at 3.

28   [30] Opp'n – ECF No. 17 at 12.

and correct to the best of my knowledge."[31] This is the form that most declarations take and

substantially complies with § 1746. *See, e.g.*, *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th

Cir. 1995) (upholding the sufficiency of a pro se plaintiff's verified complaint under § 1746, even

though it did not follow § 1746 "with precision," because he stated under penalty of perjury that

the facts in the complaint were "true and correct *as known to me*"); *Cobell v. Norton*, 391 F.3d

251, 260 (D.C. Cir. 2004) ("[a] declaration or certification that includes the disclaimer 'to

the best of the declarant's knowledge, information or belief' is sufficient under" § 1746) (cleaned

up); *Luxul Tech. Inc. v. NectarLux, LLC*, No. 14-cv-03656-LHK, 2016 WL 3345464, at *5 (N.D.

Cal. June 16, 2016) (declarant's statement — "the foregoing is true to the best of my knowledge

and subject to the penalty of perjury" — substantially complied with § 1746).

Third, Doe contends that the SEC did not establish its reasonable belief that the records are

relevant to a legitimate law-enforcement investigation.

The SEC could have said more about why it suspects Doe of insider trading: it said that SEC

economists analyzed his trading in Coherent and NeoPhotonics and "preliminarily concluded" that

it was "highly unusual when judged on a variety of metrics, including the timing of the trades and

profitability."[32] It has all of his trading records, and it did not respond to the detailed recounting by

the petitioner's capable counsel — summarized in the Statement — about why the records do not

show insider trading. It could have given more information ex parte to avoid prejudicing its

investigation. 12 U.S.C. § 3510(b). But it is undisputed that the SEC is investigating insider trading

at Lumentum, its investigation includes Doe and his great nephew (a vice president of product-line

management at Lumentum), and its investigation has resulted in charges and a settlement. "[T]he

law enforcement inquiry is legitimate. . . ." *Id.* § 3410(c); *Nicksolat*, 277 F. Supp. 3d at 128

("[W]hat need be shown [for the legitimacy inquiry] is not probable cause, but a good reason to

investigate.") (cleaned up); *Davidov v. SEC*, 415 F. Supp. 2d 386, 392 (S.D.N.Y. 2006) (SEC

investigation into insider trading satisfied § 3410 where, among other things, the trading occurred

---

[31] Geller Decl. – ECF No. 17-1 at 1–2 (¶¶ 1–2).

[32] Opp'n – ECF No. 17 at 4.

United States District Court
Northern District of California

"just before the public release of a favorable quarterly earnings report" and the customer was a "close associate[]" of a suspected tippee/tipper who had access to the inside information).

Doe contends that the SEC has not established the next prong: "a reasonable belief that the records sought are relevant to that inquiry." *Id.* The accounts did not fund the trades or receive proceeds from them, the trading records are a complete account of what he did, the SEC cites no emails or messages that show his insider trading, and he declares that he did not trade on material nonpublic information and instead relied on his expertise, including through his knowledge of Lumentum and his experience as a day trader, where — among other acts — he watched stock prices rise and took a hedged risk that a positive announcement was imminent. The SEC's only interest in the records, he contends, is that they might show that Doe paid his relative for a tip. He concludes that at most, the court should limit the subpoena to that request.[33]

The SEC counters that it has a "reasonable belief that the records are relevant to an SEC investigation" because the records "will provide Staff with information about whether Doe or others engaged in insider trading and the extent of their insider trading. Specifically, the records may provide information that Doe" either (1) paid his great nephew or others for material nonpublic information or (2) "received payments from persons who helped finance his insider trading." Also, the records "may . . . help identify additional bank accounts that are relevant to the investigation or assist" the SEC in locating assets for disgorgement if it charges Doe with insider trading.[34]

The inquiry is not whether Doe violated the law: it is whether the documents are relevant to a legitimate law-enforcement investigation. Subpoenaed information is relevant if it "touches a matter under investigation." *Nelson*, 2008 WL 2444794, at *2 (quoting *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989)). "The SEC's burden in overcoming [an] objection is not a heavy one." *Id.* The records are relevant because they will illuminate whether Doe engaged in insider trading, the extent of it, who else was involved, whether anyone was paid, and whether there are other bank accounts that might have proceeds. *In re SEC Priv.*

---

[33] Disc. Letter Br. – ECF No. 10 at 4–6; Reply – ECF No. 19 at 9; Doe Decl. – ECF No. 2-3 at 3–4 (¶¶ 8–16); *see* Statement.

[34] Opp'n – ECF No. 17 at 9.

1  *Investigation/Application of John Doe*, No. M8-85 (MBM), 1990 WL 119321, at *1–2 (S.D.N.Y.

2  Aug. 10, 1990) (in an SEC insider-trading investigation where the SEC claims bank accounts "may

3  contain records of payments in connection with the suspicious trading, including payments by [the]

4  plaintiff to others for inside information," "it is relevant to know whether [the customer]'s bank

5  account contains evidence of [illicit] conduct," even where the customer claims that different bank

6  accounts were used for the trades in question). Also, as the SEC points out, it is not required to

7  believe Doe's statements.[35] *Id.* at *2 ("By showing that [the] plaintiff has a connection to activity it

8  is charged to investigate, the SEC has shown reason for a belief that the bank records it seeks here

9  contain relevant information.").

10    Doe cites other cases where the SEC has "come forward with substantial evidence of unusually

11  suspicious behavior and/or concealment."[36] But those cases illustrate only that investigations at

12  different stages have different quanta of evidence, not that the SEC must counter any particular

13  motion to quash with a particular amount of evidence. *Nicksolat*, 277 F. Supp. 3d at 128 ("Bank

14  records are relevant to a government investigation for purposes of the [Act] if they touch on a

15  matter under investigation, even if they have only a loose connection to the core of the inquiry.")

16  (cleaned up).

17    For example, in *Davidov*, the SEC was investigating possible insider trading at a company

18  called NBTY and discovered that Morris Gad, a friend of a director of NBTY, bought NBTY

19  stock and options right before NBTY announced a record-breaking quarter. 415 F. Supp. 2d at

20  388. Davidov was an associate of Gad (in the jewelry business) and previously had transferred

21  $150,000 of NBTY shares to Gad (claiming it was payment for diamonds). *Id.* at 388–89. Davidov

22  bought NBTY stock before the announcement (and on the same day as Gad's purchase). *Id.* at

23  389. He also claimed that he was unaware of his brother's brokerage account despite transferring

24  over $330,000 into it. *Id.* Finally, there were "a number of payments in the suggestive amounts of

25

26  ─────────────────

[35] *Id.* at 10 & n.5 (quoting *Porrazzo v. SEC*, No. MC 18-00106 LEK-KSC, 2018 WL 1598655, at *5
27  (D. Haw. Apr. 2, 2018)) (the "SEC is not required to accept Movant's statements without the
opportunity to confirm them" by reviewing the subpoenaed records).

28  [36] Disc. Letter Br. – ECF No. 10 at 4 (collecting cases).

United States District Court
Northern District of California

just under $10,000" between Gad and Davidov. *Id.* at 392. Relying on this evidence, the SEC opposed Davidov's motion to quash. *Id.* at 391. The court "concluded with little difficulty" that Davidov was connected to "illicit conduct" (insider trading) and it was "relevant to know whether [his] bank account contain[ed] evidence of such conduct." *Id.* at 392. But the court did not require that showing. It just relied on it.

Similarly, in *Nelson*, the court held that the SEC met its burden to obtain bank records relevant to its investigation into possible violations of federal securities laws in connection with a kickback scheme involving an investment advisor's payments to New Mexico state treasurers. *Nelson*, 2008 WL 2444794, at *2. The advisor pleaded guilty to mail fraud, had received $4.5 million in compensation, and shared that money with other co-conspirators. *Id.* Again, the court accepted that showing but made no pronouncement that it required that quantum of evidence.

Doe also cites cases where courts have quashed subpoenas for bank records. In *United States v. Sikutwa*, in order to collect restitution, the government sought bank records — that predated marriage — from the wife of a man convicted of tax fraud. No. 4:12-cr-00056-BLW, 2016 WL 6900785, at *2 (D. Idaho Nov. 22, 2016). The government said that presumably their finances were intertwined. *Id.* The court dismissed this as speculation, in part because the government could — through the criminal judgment — access the husband's financial information, and concluded that there was no basis to order the production of the wife's premarital accounts. *Id.* In *Highguard Cap., L.P. v. SEC*, the court rejected the SEC's request for American Express records that predated the formation of the investment firm it was investigating. No. 1:21-MI-00094-MHC-AJB, 2021 WL 9638511, at *1–2 (N.D. Ga. Dec. 7, 2021). The cases do not change the outcome here. In *Sikutwa*, the government's argument was conjecture, and it had a mechanism to access financial information that was concrete. In *Highguard*, the subpoena's time frame was unrelated to the investigation.

In sum, "the court finds . . . that the law enforcement inquiry is legitimate and a reasonable belief that the records sought are relevant to that inquiry." 12 U.S.C. § 3410(c).

Fourth, Doe contends that the subpoenas are overbroad. The SEC eliminated transactions of $500 or less. That "assures that purely personal transactions in small amounts will not be disclosed." *In re SEC Priv. Investigation/Application of John Doe*, 1990 WL 119321, at *2. But

United States District Court
Northern District of California

1    Doe contends that the SEC has advanced no justification for records of purchases and payments

2    (mortgages, autos, loans, charitable contributions, insurance, credit-card payments, and other

3    personal expenses) irrelevant to the investigation.[37] The issue is whether — even if bank records

4    contain information unrelated to unlawful activity — it is enough when the bank records overall

5    contain information relevant to the SEC's investigation.[38]

6         The practical reality is that the records overall may be relevant but some records may not be

7    relevant. But that is not enough — under the weight of authority — to quash the subpoenas when

8    the records contain information relevant to the investigation. *See, e.g.*, *Gutierrez v. SEC*, No.

9    1:22:mc-0054 FMO (PVCx), 2022 WL 2101769, at *3 (C.D. Cal. Apr. 27, 2022) (collecting

10   cases). That said, there is precedent for narrowing subpoenas to allow production of

11   documentation related to defined transactions. *SEC v. Baian*, No. CV 09-7431, 2009 WL

12   10676276, at *3 (C.D. Cal. Nov. 24, 2009) (limiting production of bank records to wires, transfers,

13   and instructions). But here, narrowing the scope of production would not work: the SEC needs to

14   review the bank records to discern their relevance. The SEC has met the relevant standard: "the

15   court finds . . . that the law enforcement inquiry is legitimate and a reasonable belief that the

16   records sought are relevant to that inquiry." 12 U.S.C. § 3510(c).

17

18                                        **CONCLUSION**

19        The court denies Doe's motion to quash. This disposes of ECF Nos. 1 and 10.

20        **IT IS SO ORDERED.**

21        Dated: March 4, 2023

22                                                    _____

23                                                    LAUREL BEELER
                                                      United States Magistrate Judge
24

25

26

27   [37] Reply – ECF No. 19 at 16–17.

28   [38] Opp'n – ECF No. 17 at 17.

United States District Court
Northern District of California